IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

*v.*

AZIZ CHOUKRI

Criminal Action No.

1:21-CR-341-ELR

### United States' Sentencing Memorandum

The United States of America, by Ryan K. Buchanan, United States Attorney for the Northern District of Georgia, and Angela Adams and Tal C. Chaiken, Assistant United States Attorneys, respectfully files this sentencing memorandum in connection with the sentencing of Aziz Choukri (the "Defendant"), presently set for October 6, 2022, at 3:00 p.m.  For the reasons stated below, the Court should adopt the recommendations of the United States Probation Office on the determination of the advisory United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range and find that the applicable total offense level is 23, the Defendant's criminal history is Category I, and the advisory Guidelines range is 46 to 57 months.  The United States asks the Court to impose a sentence at the high end of the advisory Guidelines range, which is a sentence sufficient, but not greater than necessary, to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

## I.   Background

### A. Procedural History

On September 7, 2021, a grand jury in the Northern District of Georgia returned an indictment charging Defendant Aziz Choukri with twenty-seven counts of wire

fraud (18 U.S.C. § 1343) arising out of Defendant's scheme to defraud A.A. (PSR ¶¶ 1-2).  On June 16, 2022 – less than two weeks before trial – Defendant pled guilty to Count One, one of the wire fraud charges. (PSR ¶ 4).  In the plea agreement, the United States and Defendant agreed that the applicable guideline section is U.S.S.G. § 2B1.1, which yields a base offense level of seven.  (PSR ¶ 8). The United States and Defendant also agreed that the amount of loss resulting from the offense(s) of conviction and all relevant conduct is more than $550,000, but less than $1,500,000, yielding a 14-level upward adjustment. (PSR ¶ 8).  In addition, the United States and Defendant agreed that Defendant should receive a 2-level upward adjustment pursuant to U.S.S.G. § 3A1.1(b)(1) because Defendant knew or should have known that A.A. was a vulnerable victim. (PSR ¶ 8).

The United States will also recommend a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a).   (PSR ¶ 8). Neither party will seek a sentence outside of the applicable Guidelines range.  (PSR ¶ 8).

**B.  The Presentence Investigation Report ("PSR")**

The Probation Office's initial assessment of the case was largely consistent with the facts.  The United States provided additional detail and clarification with respect to the offense conduct.  This information is reflected throughout the Final PSR.  (PSR ¶¶ 11-34). The Probation Office's initial Guideline offense calculation was consistent with the recommended terms in the parties' plea agreement, *except* that it had applied a third point for early plea and acceptance. The United States objected and noted that, pursuant to the terms of the plea agreement and the Defendant's belated notification to the United States of his intent to plead guilty,

the United States does not recommend a third point. This correction is reflected in the Final PSR. (PSR ¶ 48).

The PSR also assesses a two-level upward adjustment, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(iii), because the offense conduct resulted in substantial financial hardship to one or more victims. (PSR ¶ 41). The Probation Office calculates a total offense level of 23 and Guidelines range of 46 to 57 months. (PSR ¶¶ 49). The defense did not object to the PSR.

## II. The United States' Recommendation

In determining a reasonable sentence, the Court should begin by correctly calculating the applicable Guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007); *United States v. Pugh*, 515 F.3d 1179, 1189 (11th Cir. 2008). Here, the undisputed Guidelines range is 46 to 57 months. From there, the Court should assess the factors set forth in 18 U.S.C. § 3553(a) to determine a reasonable sentence. *Gall*, 552 U.S. at 49-50; *Pugh*, 515 F.3d at 1189-90. The § 3353(a) factors include the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, and deterrence of criminal conduct. These factors support the imposition of a sentence at the high end of the Guidelines range.

### A. Nature and Circumstances of the Offense.

The nature and circumstances of the offense weigh heavily in favor of a sentence at the high end of the Guidelines range. Several aspects of the offense underscore the seriousness of the offense: (1) Defendant preyed on a 79-year-old, vulnerable victim; (2) Defendant's fraud continued for more than two years; (3) Defendant's stole and depleted approximately $650,000 of A.A.'s money.

Defendant needed money and preyed upon A.A., an elderly man who needed a friend.  When A.A. met Defendant at a gym in 2016, he was 79 while Defendant was 54. (PSR ¶ 12).  A.A. was lonely after his wife's passing a few years prior.  (PSR ¶ 37a).  Defendant implemented his scheme to defraud A.A. by acting as a genuine friend, gaining A.A.'s trust, and engaging in grooming behavior such as frequently visiting A.A., bringing him food, taking him to lunch and dinner, and helping him with his car. (PSR ¶ 13).

While A.A. saw Defendant as a friend, Defendant saw A.A. as a personal piggybank.  Defendant, through lies and empty promises, convinced A.A. to "invest" approximately $650,000 in Defendant's music business.  (PSR ¶ 13.) Among the lies, Defendant told A.A. that he worked with artists from all over the world, that he made a lot of money from his business, and that he had approximately $350 million in a Vanguard account that he could withdraw in one year. (PSR ¶ 13).  Furthermore, Defendant guaranteed A.A. that he would receive his money back, with interest, if he wanted to withdraw his investment, and made increasingly desperate promises as A.A. became hesitant about the investment. (PSR ¶ 13.)  Specifically, Defendant eventually promised A.A. that if he no longer wanted to be an investor, he would get all of his investment back, plus $1 million. (PSR ¶¶ 13-16.)

Defendant took advantage of A.A.'s trust in his feigned friendship to defraud him over and over and over again for a period of more than two years.  (PSR ¶¶ 13-18.)  Defendant's offense was not a momentary lapse in judgment.  Rather, it was a calculated, brazen fraud carried out for years.  Indeed, Defendant concealed

his fraud by convincing A.A. not to tell anyone – even A.A.'s children - about the "investment." (PSR ¶ 14).

The evidence shows that Defendant used nearly all of A.A.'s money on personal expenses for himself and his children – including college tuition and sorority dues payments, medical and dental payments, tutoring payments, repayment of a personal loan, food, gas, and Uber rides – and on cash withdrawals or significant transfers to his children.  (PSR ¶¶ 34a-d.)  Although Choukri spent a small portion of A.A.'s money (approximately 7%) on expenses that *could* be related to the music industry, the evidence shows that Defendant generally rapidly depleted A.A.'s investments on personal expenses.  (PSR ¶¶ 34d-e.)  For example, on March 6, 2017 and March 9, 2017, Defendant deposited $42,600 of A.A.'s funds into one of his accounts.  By March 17, 2017 – 11 days later – Defendant had spent more than $39,000 of those funds on his daughter's college tuition and on the repayment of a personal loan.  (PSR ¶ 34e.)  Indeed, despite Defendant's lies to A.A., he now admits that over the course of ten years, his supposed music business has *never* generated any income.  (PSR ¶ 74.)

While the Defendant was out spending A.A.'s money, A.A.'s retirement and savings accounts were dwindling.  He was forced to borrow $50,000 from his daughter and then take a Home Equity Line of Credit to pay her back.  (PSR ¶ 20).  A.A. received multiple bills from credit card companies, and multiple calls from the IRS and other debt collectors. (PSR ¶ 20).  He began feeling overwhelmed. (PSR ¶ 20).  His family noticed that he became reserved and quieter, started losing weight, and was not sleeping.  (PSR ¶ 37a).  A.A. was ultimately diagnosed with depression. (PSR ¶ 37a).

The Defendant strategically groomed Victim A.A. He preyed on the victim's loneliness and vulnerability. He deceived the victim through series of lies.  And, in the end, he used the victim as a personal piggy bank for more than two years. This nature and circumstances of this offense are egregious and warrant a high-end sentence.

### B. History and Characteristics of the Defendant.

The Defendant appears to have had a positive upbringing and, prior to this, has lived a relatively normal life.  Despite this, however, it appears that the Defendant did not make any income from any employment from at least 2012 to 2015. (PSR ¶¶ 74-75). Thereafter, he began defrauding the victim in order to pay for basic needs.  Yet, nothing in his personal background suggests that he was incapable of obtaining legitimate employment or securing legitimate income. He simply chose not to. This highlights Defendant's character.

### C. Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense

A sentence at the high end of the Guidelines range will adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

Here, Defendant engaged in a prolonged fraud that lasted years.  His conduct was calculated and strategic, and it a specifically targeted an elderly, widowed, vulnerable man. The Defendant financially benefitted substantially from the fraud, in receiving faux "investment" payments from the victim in the amount of almost $650,000. (PSR ¶34).  And, he did so by repeatedly lying and betraying the victim's trust.

6

Although this case is easily described as a financial crime against A.A., the actual harm caused by the Defendant permeates far beyond the victim's bank accounts. The Defendant's calculated scheme has affected the physical and emotional health of the victim. It has also taken a significant toll on the victim's family. (PSR ¶37(a)). This was a serious offense, and the United States contends that just punishment for this offense rests at the high end of the Guidelines range.

### D. The Need For Adequate Deterrence

In addition, a sentence at the high end of the Guidelines range will promote general and specific deterrence. The Eleventh Circuit has recognized that, "the Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white-collar criminals, even where those criminals might themselves be unlikely to commit another offense." *U.S. v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). The Court stated that "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *Id.* (quoting Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm &Mary L.Rev. 721 724 (2005)).  The court's basis for concluding this rationale was that, "defendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." *Id.* at 1240.

Here, it is undisputed that Defendant's conduct was rational and calculated, and this case would serve as a prime candidate for deterrence.

## III.    Conclusion

For the reasons set forth above, the United States asks the Court to impose a sentence at the high end of the Guidelines range.


Respectfully submitted,

RYAN K. BUCHANAN
     *United States Attorney*


/s/ ANGELA ADAMS
     *Assistant United States Attorney*
Georgia Bar No. 613114
Angela.Adams@usdoj.gov


/s/ TAL C. CHAIKEN
     *Assistant United States Attorney*
Georgia Bar No. 273949
Tal.Chaiken@usdoj.gov

8

## Certificate of Service

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

William Cromwell, Esq.

Lela Schmidt, Esq.

September 30, 2022

/s/ ANGELA ADAMS

ANGELA ADAMS

*Assistant United States Attorney*